UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RENAE MARABLE, et al.,**<br><br>     Plaintiffs,<br><br>     v.<br><br>**DISTRICT HOSPITAL PARTNERS, L.P.,**<br><br>     Defendant. | Civil Action 01-02361  (HHK) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, six Black former employees of George Washington University Hospital ("GWUH"), bring the instant action as a result of their termination on November 15, 1998.[1] Plaintiffs' employment ended when GWUH eliminated the position previously held by each plaintiff—Nursing Assistant—and replaced it with a new position, Multi-skilled Technician ("MST"). All Nursing Assistants were invited to apply to become MSTs if they satisfied a number of different requirements. Plaintiffs now challenge a specific component of these requirements—a three-part screening test—pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Plaintiffs assert these claims on their own behalf as well as on behalf of a putative class of all Black applicants for the MST position that were not hired as a result of their failure to pass GWUH's screening

---

[1] The District Hospital Partners, L.P. does business as George Washington University Hospital.

examinations. Before the court is plaintiffs' motion for class certification (Dkt. #31). Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that plaintiffs' motion must be denied.

## I. BACKGROUND

In November 1998, GWUH eliminated the Nursing Assistant position and replaced it with the MST position. According to GWUH, this reorganization was precipitated by a desire to "develop and implement new patient care models that improve[d] operational efficiency and patient satisfaction." Pls.' Opp'n, Ex. B ¶ 3 (Aff. of Karen Frazier.) The MST position was designed to have "substantially greater responsibility and higher pay" than that which it replaced; while Nursing Assistants were expected to attend to tasks primarily related to patient transport and "daily living activities," i.e., patient ambulation, monitoring vital signs, making beds, and bathing patients, GWUH envisioned that the MSTs' duties would encompass "highly technical functions related to procedures and treatments, and diagnostic testing and specimen collection." *Id.* ¶ 5–6.

GWUH established two hiring procedures for the newly created MST position: one for displaced Nursing Assistants, and to the extent that GWUH's hiring needs could not by satisfied by this pool of internal candidates, a second for external applicants.

Former Nursing Assistants who wished to become MSTs were required to first pass a battery of three screening tests: one assessing arithmetic skills, another reading comprehension, and the final writing ability.[2] The former Nursing Assistants were permitted to take each of these

---

[2] The parties dispute whether the three screening exams should be analyzed individually or as a single unit. Because the distinction does not affect the resolution of the instant motion, the court need not address the question. Nevertheless, for the sake of clarity the court notes that

three screening exams twice. In addition, those former employees that initially failed were offered free tutoring to prepare them to retake the exam. Former Nursing Assistants that passed each of these three screening tests were then admitted into a training course that lasted ten weeks and was comprised of ten distinct units. These units ranged in length from one day to several days, each concluding with a written examination. As with the screening exams, the participants in the training program were permitted to take each exam twice. The former Nursing Assistants that passed each of these ten examinations were offered employment as a MST.[3]

External candidates were subject to a different, more streamlined, hiring process. After soliciting applications for those positions not filled by former Nursing Assistants, GWUH selected candidates that it believed had the requisite education and experience and then permitted them to take the three screening tests administered to the internal applicants. Unlike the displaced Nursing Assistants, external applicants were only provided one opportunity to pass each exam and GWUH did not offer any assistance in preparing for the exams. The external applicants that passed the exams were not guaranteed to receive a position nor where they admitted into a training program. Instead, they were evaluated against the other external applicants that had passed the exam.

Plaintiffs, all former Nursing Assistants, challenge GWUH's use of these screening exams as a selection device. Plaintiffs insist that the examination had a disparate impact on

---

it will refer to the three screening tests in the plural, but takes no position as to the proper unit of analysis with respect to issues such as the validation of the tests.

[3] GWUH offered alternative employment to the Assistants that failed to pass any component of the aforementioned exams. Pls.' Opp'n, Ex. B ¶ 17 (Aff. of Karen Frazier.)

Black applicants, and as a result, ask the court for various forms of relief intended to address the alleged discriminatory effect of the examination.

## II. ANALYSIS

### A. Plaintiffs' Proposed Class

Plaintiffs seek to certify a class of all Black applicants for the MST position at GWUH—including applicants formerly employed as Nursing Assistants by GWUH and external candidates—who were not hired due to their failure to pass the screening tests. This construction of plaintiffs' class represents a departure from that which is outlined in their complaint. Plaintiffs originally envisioned a much broader class that included "(a) those who failed the reading, writing, and math screening test; (b) those who failed the ten-part training course; and (c) those who refused to take the screening test at all." Pls.' Reply at 8; *see also* Second Am. Compl. ¶¶ 49–50. Following a lengthy discovery period and time to digest the arguments of opposing counsel, plaintiffs have since narrowed the scope of the class that they wish to certify.

As the party moving for class certification, plaintiffs bear the burden of establishing that the requirements for class certification, as set forth in Rule 23 of the Federal Rules of Civil Procedure, have been satisfied. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs, therefore, must show that they satisfy all four prerequisites of Rule 23(a). *Hartman v. Duffey*, 19 F.3d 1459, 1468 (D.C. Cir. 1994); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 256 (D.D.C. 2002). These requirements are: (1) that the class is so numerous that joinder of all members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) that the representative parties will fairly and adequately protect the interests of the

class.  FED. R. CIV. P. 23(a).  In addition, plaintiffs must also demonstrate that the class falls within at least one of the three categories set forth in Rule 23(b).  A district court exercises broad discretion in deciding whether plaintiffs have carried their burden.  *Hartman,* 19 F.3d at 1471 (citing *Bermudez v. U.S. Dep't of Agric.*, 490 F.2d 718, 725 (D.C. Cir. 1973)).

The question of class certification is a preliminary question distinct from the merits of the case.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).  As the Supreme Court pointed out in *Eisen*, when "determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.* at 178 (internal quotation omitted).  While courts may not conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action, *id.* at 177, the court may consider matters beyond the pleadings to ascertain whether the asserted claims or defenses are susceptible to resolution on a class-wide basis.  *See McCarthy v. Kleindienst*, 741 F.2d 1406, 1419 n.8 (D.C. Cir. 1984).

Having set forth the proper analytical framework, the court now turns to its application of Rule 23's requirements to the case at hand.  The court will address first commonality—the most fiercely contested of the certification requirements—given that failure to meet any of Rule 23's requirements is sufficient to defeat certification.

### 1. *Commonality*

Rule 23(a)(2) requires that there be questions of fact or law common to the class.  FED. R. CIV. P. 23(a)(2).  This rule does not require commonality on every fact or on each issue of law.  *Franklin v. Barry*, 909 F. Supp. 21, 30 (D.D.C. 1995); *Forbush v. J.C. Penney & Co. Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993).  Rather, "[t]he commonality test is met when there is at least

one issue, the resolution of which will affect all or a significant number of the putative class members." *Coleman v. Pension Benefit Guar. Corp.*, 196 F.R.D. 193, 198 (D.D.C. 2000) (internal quotation omitted).

Here, plaintiffs submit that the common issue presented is the validity of GWUH's requirement that all applicants for the MST position pass the three screening tests.[4] Despite the fact that the substance of the screening tests given to the external applicants and the former Nursing Assistants was apparently identical, GWUH argues that "the tests were given as part of two different employment procedures at two different times, and for different reasons." Def.'s Supp. Br. at 3. GWUH contends that the screening tests were administered to the displaced Nursing Assistants in order to allow GWUH to assess their ability to succeed in the ten-week training program in which they were permitted to enroll after passing the exam. External applicants, however, were asked to take the screening exams to determine whether they "had the minimum proficiency in reading, writing and math required for the job." *Id.* at 4. According to GWUH, the purpose of each test was distinct despite the fact that the content was the same.

While at first blush GWUH's attempt to distinguish the screening tests given to the internal applicants and external applicants might appear to be a *post hoc* invention to defeat class

---

[4] More specifically, plaintiffs argue that there are at least four common questions uniting the putative class members: (1) "whether the challenged test has a disparate impact on African-American test takers; (2) whether the test is a valid predictor of success for the MST position;" (3) "whether there is a less discriminatory selection mechanism that Defendant could have used for filing all MST positions;" and (4) assuming plaintiffs establish defendant's liability, "there will be the common question of what injunctive relief is needed to change GWUH's policies with respect to the MST position and to ensure that a non-discriminatory selection process is used in filling future vacancies for MST positions." Pls.' Resp. to Def.'s Supp. Br. at 10.

certification, the court is mindful that the focus of the court's inquiry is not the merits of the case, but whether this action is suitable for class treatment. Thus, whether or not a single test can effectively perform two functions is not, at this juncture, a concern. Rather, the court's primary inquiry is whether the alleged dual purposes of the test administered to former Nursing Assistants and external applicants for the MST position undermines the commonality of the issues presented in this case. The court concludes that it does.

Plaintiffs rely on a disparate impact theory. Disparate impact cases are subject to the familiar burden-shifting framework utilized in employment discrimination cases. In a disparate impact case, the burden initially falls to the plaintiff to set forth a prima facie case. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425 (1975). This "may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group."[5] *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 349 (1977). In the next step, the burden shifts to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i); s*ee also Griggs v. Duke Power Co.,* 401 U.S. 424, 431 (1971). Finally, assuming the defendant demonstrates business necessity, the plaintiffs are then afforded an opportunity to demonstrate that an alternative employment practice could meet the employer's legitimate needs without a similar discriminatory effect. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(ii); *Albemarle Paper Co.,* 422 U.S. at 425.

---

[5] A plaintiff need not prove discriminatory intent but is required to make a showing, typically through statistical evidence, that the challenged practice has a substantially disproportionate impact on the protected class. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988); *Arnold v. U.S. Postal Serv.*, 863 F.2d 994, 996 (D.C. Cir. 1988); *Batson v. Powell*, 912 F. Supp. 565, 572 (D.D.C. 1996).

The significance of the different purported functions served by the screening tests relates to these respective burdens. Because, according to GWUH, each test was used for a different purpose, each test must be validated based on a different set of criteria. That is, GWUH must demonstrate that the selection criteria is "job related" to success within the training program, as well as "job related" to successful performance of the responsibilities and duties associated with the MST position. Assuming GWUH fulfills its obligation, plaintiffs will then be required to identify an alternative, but less discriminatory, practice capable of distinguishing former Nursing Assistants qualified to participate in the MST training program. In addition, they will be obligated to demonstrate the existence of an alternative practice for ensuring that external candidates having the minimum mathematic, reading, and writing skills to serve as a MST. The need to prove these two different categories of information defeats any assertion that a common issue exists.

The distinction between requiring that a defendant demonstrate a given screening examination is "job related" to performance in a position's training program rather than "job related" to performance in the position itself is a meaningful one. In *Washington v. Davis*, 426 U.S. 229 (1976), at issue was the validity of a screening exam used to determine entrance into the District of Columbia's Metropolitan Police Department's officer training program. The Supreme Court reversed a decision by the D.C. Circuit that had erroneously concluded that the proper focus of the inquiry was the relationship of performance on the entrance exam to performance as a police officer. Instead, the Court agreed with the view of the trial court, which had found that "a positive relationship between the test and training-course performance was sufficient to validate the former wholly aside from its possible relationship to actual performance as a police

officer." *Id.* at 250. The Court further observed "that some minimum verbal and communicative skill would be very useful, if not essential, to satisfactory progress in the training regimen."[6] *Id.* Here too GWUH argues that the screening test, when administered to Nursing Assistants, was a means of determining who could succeed in the training program. *Washington v. Davis* then, supports the conclusion that a distinction exists in the manner by which GWUH will defend its employment practices.[7]

Thus, while plaintiffs posit that their claim presents one central question: whether "the test is a valid predictor of success in the job," Pls.' Reply at 5, in fact, this case presents two

---

[6] The court is aware that a number of other Circuits require that "where selection tests are shown to predict successful performance in a training program, the study must further demonstrate a link between successful performance in the training program and on the job." *Gonzales v. Galvin*, 151 F.3d 526, n.9 (6th Cir. 1998) (citing *Harless v. Duck*, 619 F.2d 611, 616–17 (6th Cir. 1980); *Guardians Ass'n of the New York Police Dep't, Inc. v. Civil Serv. Comm'n*, 633 F.2d 232, 244–47 (2d Cir. 1980) (*aff'd* 463 U.S. 582 (1983); *Ensley Branch of NAACP v. Seibels*, 616 F.2d 812, 817–22 (5th Cir 1980)). This additional step in the process of demonstrating the validity of using the screening exams as a selection device for GWUH's ten-week MST training program, however, only reinforces the court's conclusion that the difference in the claims of external candidates and former Nursing Assistants renders class certification inappropriate.

[7] The permissibility of validating an exam against performance in a training program finds additional support in the Equal Employment Opportunity Commission's ("EEOC") Uniform Guidelines on Employee Selection Procedures ("Uniform Guidelines"). In discussing acceptable elements of job performance against which to judge the validity of a selection procedure, the Guidelines implicitly recognize "performance in training." The Uniform Guidelines state, in pertinent part:

> Where performance in training is used as a criterion, success in training should be properly measured and the relevance of the training should be shown either through a comparison of the content of the training program with the critical or important work behavior(s) of the job(s), or through a demonstration of the relationship between measure of performance in training and measures of job performance. Measure of relative success in training include but are not limited to instructor evaluations, performance samples, or tests. Criterion measures consisting of paper and pencil tests will be closely reviewed for job performance.

§ 29 C.F.R. 1607.14(B)(3)

9

questions: (1) whether, for external candidates, the test is a valid predictor of success in the job, and (2) whether, for former Nursing Assistants, the test is a valid predictor of success in the ten-week training program offered by GWUH. Indeed, despite plaintiffs' protestations to the contrary, defendant's validation study confirms, not belies, GWUH's assertion that it used the screening test for these two purposes. This study, performed by Stanley Ridley, Ph.D, professes to examine both "whether a relationship exists between the knowledge/skills assessed by the three screening instruments, and the knowledge/skills needed for MSTs to perform their expected tasks," as well as "whether each screening instrument is related to performance on the MST Training Program module tests . . . ." *See* Pls.' Resp. to Def.'s Supp. Br., Ex. 1 at 3–4 (Report of Stanley Ridley, Ph.D.). Dr. Ridley's report states explicitly that the latter assessment "was done because each screening instrument was initially chosen for the same purpose: to help assess which MST applicants could successfully complete the MST training program." *Id.* at 43.

Because plaintiffs' challenge ultimately seeks resolution of these two questions, not one, the court holds that plaintiffs' have failed to demonstrate commonality.

### 2. *Typicality*

The question of commonality is closely related to Rule 23(a)(3)'s requirement that plaintiffs establish that the claims of the class representatives are typical of those of their class. *See*, *e.g.*, *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, n.13 (1982) ("[t]he commonality and typicality requirements of Rule 23(a) tend to merge."). This requirement is intended to ensure that "the class representatives have suffered injuries in the same general fashion as absent class members." *In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260 (internal quotation omitted). It is satisfied if "each class member's claim arises from the same course of events that led to the claims of the

representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Pigford v. Glickman*, 182 F.R.D. 341, 349 (D.D.C. 1998) (citing *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994)).

As with commonality, plaintiffs fail to satisfy this requirement. When examining typicality, "the court must consider whether [the plaintiff] suffered injury from a specific discriminatory . . . practice of the employer in the same manner that the members of the proposed class did, and whether [the plaintiff] and the class members were injured in the same fashion by a . . . policy of employment discrimination." *Wagner v. Taylor*, 836 F.2d 578, 591 (D.C. Cir. 1987). With respect to the typicality of the policy at issue, here, the class representatives are composed exclusively of former Nursing Assistants; there is not one external applicant among the named plaintiffs. *See* Second Am. Compl. ¶¶ 8–13. Accordingly, every class representative was subjected to the policy of taking an exam for admittance into a training program. As discussed above, there is an important distinction between this policy and the policy to which external applicants are subjected. The difference in policy will affect both the burden that GWUH will face, and the manner in which plaintiffs will need to respond.

In addition, although the court disagrees with GWUH's assertion that former Nursing Assistants were not actually injured by the screening tests, Def.'s Supp. Br. at 12, the court does believe that the nature of the injuries suffered is distinct. Certainly, if the nature of the respective plaintiffs' injuries is construed broadly, recognizing a certain degree of similarity between the injury suffered by former Nursing Assistants and external applicants for the MST position is

unavoidable. Both groups of individuals were required to pass the same screening examination as part of their respective paths to becoming a MST and those that failed the exam were precluded from acquiring the position.

If the application process for each group is examined more closely, however, it is evident that different injuries were suffered. As the court stated previously, the difference between being refused admittance into a training program and being refused consideration for a position is significant. External applicants were denied a chance to compete against other external applicants while former Nursing Assistants were denied a chance to enroll in a training program, the successful completion of which would have automatically resulted in acquiring a position.

Plaintiffs have failed to demonstrate the typicality and commonality of their claims, accordingly, the court refuses to certify plaintiffs' proposed class.

**B.  Possibility of Subclasses**

Having concluded that class treatment is inappropriate, the court has considered the possibility of creating subclasses in order to cure the deficiencies in plaintiffs' application. It is well settled that if subclasses are to be certified, each subclass must independently satisfy Federal Rule of Civil Procedure 23's requirements. *See, e.g. Twelve John Does v. Dist. of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997) ("[A]s Fed. R. Civ. Pro. 23(c)(4)(B) authorizes the district court to create subclasses 'when appropriate,' it implies the need for reasonable discretion, even recognizing that any subclass must independently meet the standards for class certification."). In light of this requirement, the court holds that the creation of subclasses is not feasible.

*a. Subclass of Former Nursing Assistants*

Rule 23(a)(1) demands that plaintiffs demonstrate that "the class is so numerous that joinder of all members is impracticable." Here, plaintiffs have failed to carry their burden given that, to the best of the court's knowledge, they have made no representation as to the number of individuals encompassed in the possible subclass of Black former Nursing Assistants that failed the screening examinations. According to GWUH, the parties disagree as to the size of this potential subclass; GWUH contending that only seventeen Nursing Assistants failed the exam and stating that plaintiffs believe that thirty former Nursing Assistants failed the examination. Even assuming that approximately thirty former Nursing Assistants failed the examination, the court holds that this subclass would be too small to satisfy Rule 23(a)'s numerosity requirement. *See Thomas v. Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996) ("Although Rule 23 requires no minimum number of class members, numerosity is generally satisfied by a proposed class of at least 40 members.") (reversed in part on other grounds); *Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, n.10 (D.C. Cir. 1988) ("We are aware of no appellate decision reversing a district court's denial of class certification on grounds of inadequate numerosity where fewer than 40 prospective members exist.").

*b. Subclass of External Applicants*

A subclass of Black external applicants that failed the screening exam, though likely to satisfy the numerosity requirement,[8] is also untenable. As discussed above, there is not a single

---

[8] The court assumes that roughly 140 Black external applicants failed the screening tests. The court arrives at this assumption after subtracting the thirty former Nursing Assistants that failed the screening examination from plaintiffs' generalized representation "that approximately 172 African-Americans failed at least one of the components of the three-part screening test (thereby failing the entire screening test)," Pls.' Mot. at 7.

external applicant among the class representatives and therefore, no class representative that took the screening exams to determine whether he or she had the minimum reading, writing and math skills to act as an MST. Because this subclass has no representative, it cannot be certified. *See, e.g., Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.").

### III.  CONCLUSION

For the aforementioned reasons, it is this 31st day of August, 2006, hereby

**ORDERED** that plaintiffs' motion for class certification (Dkt. #31) is **DENIED**.

                                                  Henry H. Kennedy, Jr.
                                                  United States District Judge